Approved: _____
SCOTT HARTMAN / DOUGLAS ZOLKIND
Assistant United States Attorneys

Before:    THE HONORABLE PAUL E. DAVISON
           United States Magistrate Judge
           Southern District of New York

------------------------------------- X
                                      :
UNITED STATES OF AMERICA              :   COMPLAINT
                                      :
           -v.-                       :   Violations of 18 U.S.C.
                                      :   §§ 922(g), 1073
EDWIN PALESTINA,                      :
     a/k/a "Edwin Palestine,"         :   COUNTY OF OFFENSE:
     a/k/a "Edwin Toro,"              :   WESTCHESTER
                                      :
                Defendant.            :   15 m 2090
                                      :
------------------------------------- X

SOUTHERN DISTRICT OF NEW YORK, ss.:

       BRIAN MENTON, being duly sworn, deposes and says that he is a Task Force Officer assigned to the Federal Bureau of Investigation's Westchester County Violent Crimes Task Force, and charges as follows:

COUNT ONE
(Felon in Possession of Ammunition)

       1.   On or about May 1, 2014, in the Southern District of New York, EDWIN PALESTINA, a/k/a "Edwin Palestine," a/k/a "Edwin Toro," the defendant, after having been previously convicted in a court of a crime punishable by imprisonment for a term exceeding one year, knowingly did possess in and affecting commerce ammunition, to wit (1) Winchester .40-caliber bullets, and (2) Hornady .40-caliber bullets, both of which previously had been shipped and transported in interstate and foreign commerce.

       (Title 18, United States Code, Section 922(g)(1).)

COUNT TWO
(Unlawful Flight to Avoid Prosecution)

2. From on or about May 4, 2014, until on or about the date of this Complaint, in the Southern District of New York, and elsewhere, EDWIN PALESTINA, a/k/a "Edwin Palestine," a/k/a "Edwin Toro," the defendant, did move and travel in interstate and foreign commerce with intent to avoid prosecution under the laws of the State of New York for a crime that is a felony under the laws of the State of New York, to wit, PALESTINA traveled from New York to Texas in an effort to avoid prosecution under New York State law for his role in a murder committed in Yonkers, New York, on or about May 1, 2014.

(Title 18, United States Code, Section 1073)

The bases for my knowledge and for the foregoing charge are, in part, as follows:

3. I have been personally involved in the investigation of this matter, and I base this affidavit on that personal experience, as well as on my conversations with other law enforcement agents and my examination of various reports and records. Because this affidavit is being submitted for the limited purpose of establishing probable cause for the offense cited above, it does not include all the facts that I have learned during the course of the investigation. Where the contents of conversations of others are reported herein, they are reported in substance and in part.

4. I have spoken with a sergeant ("Sergeant-1") employed by the Police Department of the City of Yonkers, New York ("CYPD") regarding a homicide that took place in Yonkers on or about May 1, 2014, and I have reviewed CYPD documents related to that homicide. From these sources, I have learned the following information, in substance and in part:

   a. On or about May 1, 2014, at approximately 1:56 a.m., members of the CYPD responded to a report of shots fired in the vicinity of 220 Woodworth Avenue in Yonkers. 220 Woodworth Avenue is located on the east side of Woodworth Avenue, approximately one house away from the northeast corner of Woodworth Avenue and Gold Street. Upon arriving at the scene, the officers observed a dead male lying on the ground (the "Victim").

   b. At the scene, Sergeant-1 spoke with an individual ("Witness-1") who had personally witnessed the

2

shooting that resulted in the death of the Victim. Witness-1 stated, in substance and in part, that shortly before the shooting, he observed two males wearing hooded sweatshirts approach the Victim, who was outside of 220 Woodworth Avenue, and that the two males both had guns drawn and shot repeatedly at the Victim.

        c. CYPD investigators also spoke to another individual ("Witness-2"), who resides in a building near the southwest corner of Woodworth Avenue and Gold Street. Witness-2 stated, in substance and in part, the following: On the night of the shooting he was awoken by gunshots. Witness-2 went to his window and saw a grey van with tinted windows and a roof rack double-parked on the north side of Gold Street. The van appeared to be missing the hubcaps on the driver's side. While he was standing at the window, Witness-2 saw two males run towards the vehicle and get inside. One of the males appeared to be carrying a handgun in his right hand. Both males were wearing hooded sweatshirts that covered their heads.

        5. I have also reviewed a report prepared by a member of the CYPD Crime Scene Unit that responded to the vicinity of 220 Woodworth Avenue following the homicide. According to this report, 12 shell casings were recovered from the scene of the homicide. All 12 of these shell casings were designed for .40-caliber weapons. Six (6) of the shell casings were manufactured by Winchester and six (6) were manufactured by Hornady.

        6. Additionally, I have spoken with a CYPD detective who participated in the investigation of the homicide ("Detective-1"). From speaking with Dective-1, I have learned the following information, in substance and in part:

        a. Minutes before the homicide, a license plate reader in the vicinity of 220 Woodworth Avenue captured a vehicle fitting the above-referenced description provided by Witness-2 (the "Getaway Vehicle") proceeding in the direction of 220 Woodworth Avenue. The Getaway Vehicle had New York State license plate GPL-2484.

        b. Detective-1 interviewed the registered owner of the Getaway Vehicle. The registered owner, in turn, referred Detective-1 to her boyfriend (the "Boyfriend"), who she indicated was the regular driver of the car. Detective-1 later interviewed the Boyfriend, who stated, in substance and in part, that during the time of the homicide he had lent the Getaway Vehicle to his son, whom he identified by name ("CC-1").

    c. On or about May 2, 2014, Detective-1 and other members of the CYPD located CC-1 in Ardsley, New York. At that time, CC-1 agreed to speak with law enforcement officers about the homicide.

    d. During subsequent questioning by members of the CYPD as well as a Special Agent with the Federal Bureau of Investigation, CC-1 agreed to assist federal and state authorities in their investigation of the shooting in hopes of receiving prosecutorial leniency. CC-1 has provided the following information, in substance and in part:

     i. CC-1 stated that, on the night of the homicide, he picked up two other individuals -- a fellow co-conspirator ("CC-2") and EDWIN PALESTINA, a/k/a "Edwin Palestine," a/k/a "Edwin Toro," the defendant -- in the Getaway Vehicle. CC-1 identified both CC-2 and PALESTINA by name.

     ii. CC-1 stated that, during the course of the evening, he, CC-2 and PALESTINA agreed to drive around in the Getaway Vehicle for the purpose of looking for the Victim, with whom they had an ongoing dispute. Eventually, they located the Victim's car as it was being driven in Yonkers. The Getaway Vehicle followed the Victim's car to the vicinity of 220 Woodworth Avenue, where the men observed the vehicle park and the Victim get out.

     iii. CC-1, who was driving the Getaway Vehicle west on Gold Street, stopped just before the intersection with Woodworth Avenue and let CC-2 and PALESTINA out of the car. CC-1 continued across Woodworth Avenue, and double-parked the Getaway Vehicle on the west side of Woodworth Avenue.

     iv. Shortly after CC-1 let CC-2 and PALESTINA out of the Getaway Vehicle, CC-1 heard multiple gunshots. Moments, later CC-2 and PALESTINA jumped back into the Getaway Car and CC-1 drove away from the scene.

     v. CC-1 provided law enforcement officers with the dial number of a cellular telephone used by CC-2 (the "CC-2 Cellphone").

    e. On or about Sunday, May 4, 2014, CYPD investigators, including Detective-1, tracked the CC-2 Cellphone to a flower shop in Mount Vernon, New York (the "Flower Shop"). Investigators entered the Flower Shop, located CC-2, and placed him under arrest.

4

    f. Subsequent to his arrest, CC-2 was read Miranda warnings. CC-2 waived his rights and stated, in substance and in part, that both he and PALESTINA shot at the Victim in the vicinity of 220 Woodworth Avenue.

    g. After CC-2 was arrested, investigators interviewed a witness ("Witness-3"), who stated, in substance and in part, that he was present with PALESTINA in the Flower Shop just prior to CC-2's arrest. Witness-3 said that as police were entering the Flower Shop to arrest CC-2, PALESTINA hid in a walk-in freezer to avoid being arrested. Surveillance footage obtained from the Flower Shop is consistent with Witness-3's account.

    h. Witness-3 also stated that, after CC-2's arrest, Witness-3 and several other individuals drove PALESTINA to Manhattan. He said that PALESTINA initially attempted to book passage on a Chinese-operated bus. When he was unsuccessful, the group drove to the vicinity of West 42nd Street and 8th Avenue and let PALESTINA out of the car. During the drive, Witness-3 heard one of the individuals in the car mention that it would take PALESTINA three days to get to his destination.

    i. Based on his familiarity with Manhattan geography, Detective-1 believes that PALESTINA got out of the car in the vicinity of West 42nd Street and Eight Avenue because he intended to catch a bus at the Port Authority Bus Station, which is located in that area.

    j. The day after he rode with PALESTINA to the vicinity of West 42nd Street and Eight Avenue, Witness-3 was present during a conversation between associates of PALESTINA. Most of the discussion took place in Spanish, a language that Witness-3 does not understand. However, during the conversation, Witness-3 heard the speakers mention the word "Houston" in close proximity to the name "Toro," which Witness-3 knows to be a nickname for PALESTINA.

    k. Based on the conversations he overheard in the car with PALESTINA and the conversation he overheard the following day, Witness-3 believed that PALESTINA was destined for Houston, Texas.

    7. On or about June 16, 2015, fellow members of the FBI Violent Crimes Task Force, with whom I have spoken, arrested PALESTINA on probable cause in Houston, Texas.

8. I have spoken with a Special Agent of the Bureau of Alcohol, Tobacco, Firearms and Explosives (the "Agent") who is familiar with the manufacturing of firearms and ammunition. The Agent has informed me that, based on his training and experience, neither Winchester nor Hornady has ever manufactured ammunition within the State of New York.

9. Based on my review of criminal history records of EDWIN PALESTINA, a/k/a "Edwin Palestine," a/k/a "Edwin Toro," the defendant, I know that PALESTINA was convicted on or about December 23, 2009, in Westchester County Court, of Assault in the Second Degree, a Class D Felony, in violation of New York Penal Law Section 120.05. Under New York law, Assault in the Second Degree is a crime punishable by a term of imprisonment exceeding one year.

WHEREFORE, the deponent respectfully requests that a warrant issue for the arrest of EDWIN PALESTINA, a/k/a "Edwin Palestine," a/k/a "Edwin Toro," the defendant, and that he be arrested and imprisoned, or bailed, as the case may be.

_____
BRIAN MENTON
Task Force Officer
Federal Bureau of Investigation

Sworn to before me this
16th day of June 2015

_____
THE HONORABLE PAUL E. DAVISON
United States Magistrate Judge
Southern District of New York

6